## Commonwealth ex rel. Kelley, Appellant, *v.* Pommer et al.

422

Argued January 4, 1938. Before KEPHART, C. J., MAXEY, DREW, LINN, STERN and BARNES, JJ.

The Act of June 25, 1919, P. L. 581, provides, in part, as follows:

### "ARTICLE XVII.

#### "FINANCE.

"Section 1.  On or before the fifteenth day of October of each year, the mayor shall furnish to the council, in such form and detail as the council shall have determined, a statement of the estimated receipts, other than from taxation, including money proposed to be borrowed and liabilities of every kind for the ensuing calendar year and the estimated expenditures for such year of all departments, officers, boards, commissions, trusts, committees, or other agencies, whose financial requirements are to be met out of the proceeds of taxes levied by the council or out of any other funds over which the council has control, designating which of such liabilities

and expenditures should be met from current receipts and which should be met from loan funds. The estimates of receipts and liabilities shall be furnished to the mayor by the city controller. He shall also furnish to the mayor a statement of the borrowing capacity of the city. Such statements shall be made up by the city controller from the best available data, and the receipts from sources other than taxation and loans shall be estimated at the average of such receipts for the preceding three years, with due allowance for new sources of receipts not existing during all or part of said period of three years, for sources of receipts existing during all or part of said period which will not be available for the ensuing year, for changes in rates, and for other factors not previously existing. The estimates to be furnished by the city controller to the mayor, and by him transmitted to the council, shall also contain a statement of the average proportion of taxes uncollected at the end of each of the three preceding years. The estimated statement of expenditures shall be made up by the mayor from information supplied him by such departments, officers, boards, commissions, trusts, committees, and other agencies, subject to revision by the mayor in his discretion.

"Section 2. Immediately after the receipt of such statement, the council shall consider the same in open sessions, affording a reasonable opportunity to officers and citizens to be heard thereon, and the council shall, in one ordinance, on or before the fifteenth day of December following, adopt a financial program for the ensuing year, showing the estimated receipts from all sources, the liabilities of every kind, and the amount and character of expenditures to be made by such departments, officers, boards, commissions, trusts, committees, and other agencies during the ensuing year. In passing said ordinance the council shall be bound to accept the estimates of receipts and liabilities furnished to the mayor by the city controller, but shall have full dis-

cretion to determine the character and amount of expenditures to be made out of the estimated receipts of the city during the ensuing year.

"Section 3. On or before the same date, the council shall levy and fix a tax rate for the ensuing year, which, together with the estimated receipts from all other sources except borrowed money, shall yield sufficient receipts to meet the liabilities of the city of every kind (except liabilities to be paid out of loan funds) for the ensuing year and the current expenditures, not including expenditures from loan funds, as fixed and determined by the council in said ordinance. The receipts from taxation shall be estimated by deducting, from the gross amount which would be yielded at the rate fixed, the average proportion of the amount uncollected at the end of each year during the preceding three years. If the council shall fail to fix a tax rate on or before the fifteenth day of December of any year, the rate for the current year shall be the rate for the ensuing year as if that rate had been fixed by the council in accordance with this act, and the amount of expenditures, other than from loan funds, shall be fixed and determined by the council so as to come within the estimated receipts from sources other than loans.

"Section 4. The council may, from time to time, make appropriations out of such estimated receipts of the city for the ensuing year to meet the requirements of such departments, officers, boards, commissions, trusts, committees, and other agencies, as determined by the council, but from the receipts of the city from taxation and sources, other than loan funds, estimated as provided in this article, the council shall appropriate, before the beginning of the ensuing year, a sufficient amount for the extinguishment of the floating indebtedness (other than that accruing within one year from condemnation of real property) which the city controller may estimate to be outstanding upon the first of January following, for the payment of all lawful obligations due by the city

during the fiscal year commencing January first, and for such expenditures to be met from such receipts as may be authorized by the council; and the city controller shall not countersign any warrants (except for payment of interest and for sinking fund) pertaining to any of the appropriations until the said council shall have first passed all appropriations necessary for the expenses for the current year of each department, officer, board, commission, trust, committee or other agency whose financial requirements are to be met out of the proceeds of taxes levied by the council or out of any other funds over which the council has control, nor shall said officer countersign any warrants, except as aforesaid, until the total of all appropriations and all lawful obligations (other than as aforesaid), as estimated by the city controller, shall have been brought within the sum of the estimated receipts from taxes and from other sources except loan funds. No contract shall be binding upon the city unless an appropriation therefor has previously been made (except as otherwise provided in this act) ; and no warrant shall be drawn, issued, or approved by any officer of said city for any expenditure by such department, officer, board, commission, trust, committee, or other agency, unless an appropriation has previously been made in accordance with the provisions of this act; and no warrant shall be drawn against any item in said appropriation in excess of said item; and any contract made or warrant issued in violation of this article shall be absolutely void. Any appropriation in violation of this article or in excess of the estimated receipts as set forth in said ordinance and any contract based thereon shall be void: Provided, however, that the council shall have the power to appropriate money received in excess of said estimate, upon the certificate of the city controller that there have been such excess receipts : And provided further, that surplus receipts, if any, carried over from one year into the next may be appropriated during the next said year, in addi-

tion to the appropriation of the said estimated receipts for that year. Said appropriations, if within the limits aforesaid, shall be valid, and contracts may be lawfully based thereon, although the money estimated to be received during the said year shall not actually have been received or be in the treasury at the time of said appropriation or contract: And provided further, that the council may by ordinance make transfers from one item of appropriation to another."

*Charles E. Kenworthey,* for appellant.

*Joseph Sharfsin,* City Solicitor, with him *Herman N. Schwartz* and *Ernest Lowengrund,* Assistant City Solicitors, for appellees.

OPINION BY MR. JUSTICE LINN, May 16, 1938:

This appeal turns on the meaning of part of the Act[1] of June 25, 1919, P. L. 581, 53 PS section 2901 et seq., entitled: "For the better government of cities of the first class of this Commonwealth", commonly known as the Charter Act for Philadelphia. Four sections of Article XVII, P. L. 605, 53 PS section 3271 et seq., call for particular attention. Section 1 requires that, on or before the 15th day of October in each year, the mayor "shall furnish to the council" certain information in part based on information to be furnished to him by the city controller. Section 2 provides that council

---

[1] It is matter of common knowledge that this act grew out of a bill drafted under the auspices of a committee known as the Philadelphia Charter Committee for the purpose, inter alia, of correcting recognized defects and supplying serious deficiencies in administration of the city's finances.

shall be bound to accept estimates of receipts and liabilities furnished to the mayor by the city controller and shall consider the subject in open session, with reasonable opportunity to officers and citizens to be heard and, shall adopt, in one ordinance, by December 15th, a financial program for the ensuing year, as specified. Section 3 requires council to levy and fix the tax rate for the ensuing year on or before December 15th, subject to the conditions mentioned in the ordinance; the legislature specifically directed that "if the council shall fail to fix a tax rate on or before the 15th day of December of any year, the rate for the current year shall be the rate for the ensuing year. . . ." Section 4 authorizes appropriations out of the estimated receipts and requires that "council shall appropriate, before the beginning of the ensuing year, a sufficient amount for the extinguishment of the floating indebtedness (other than that accruing within one year from condemnation of real property) which the city controller may estimate to be outstanding upon the first of January following, for the payment of all lawful obligations due by the city during the fiscal year commencing January first." During the ensuing year, the controller must not countersign any warrants, except for sinking fund and interest payments, until council shall first have passed all appropriations necessary for the expenses for the current year of each city department, and within the estimated receipts from taxes and other sources except loans. No contract shall be binding without previous appropriation and no warrant shall be drawn for any expenditure without such appropriation; any warrant or contract otherwise issued shall be void. This section contains other relevant limitations as may be seen by consulting the section in the reporter's statement.

The record shows that by December 15, 1937, no financial program for the year 1938 had been adopted. It also appears that "before the beginning of the ensuing year" (to use the words of the statute) the required

appropriations had not been made. On December 16th this proceeding was begun in the name of the Commonwealth, at the relation of the District Attorney, praying for a peremptory writ of mandamus requiring respondents to comply with the statute. An alternative writ was issued and a return was filed to which petitioner demurred. The learned court below, after hearing on the demurrer, dismissed the petition on the ground that the provisions of the statute were not mandatory. Immediately after the argument of the appeal, on January 24, 1938, we filed an order containing the following: "It is ordered and decreed that a writ of peremptory mandamus shall issue forthwith, commanding City Council on or before January 31,[2] 1938, to adopt a budget and a financial program as required by law; writ returnable to this Court February 1, 1938."

The record, then, shows that the year 1937 ended without the adoption of a financial program for 1938. This failure to adopt such a program was in clear violation of the law. The Act required the mayor, the city controller and council to comply with its provisions during 1937 so that obligations maturing on and after January 1, 1938, would be provided for. The legislature not only did not intend that the city should begin the ensuing year without provision having been made for the cost of the municipal government from January 1st on, but, in addition, had taken care to provide that if the tax rate was not fixed by December 15th on property then subject to taxation, the old tax rate should remain in effect. This mandamus proceeding called the attention of the learned court below to the default of the municipal authorities, and, as the statute clearly provided that no money could be expended after the first of January for running expenses, the learned court should have immediately granted the peremptory writ in order

---

[2] This date was fixed in consequence of the statement made during argument by the city solicitor that sufficient progress had been made by council to complete its work by January 28th.

that the municipal government from and after January, 1938, would have been provided for. The deplorable consequences likely to result from the failure to comply with the law might readily be imagined, but in this case it is unnecessary to deal with conjecture; the result of the default appears in the city controller's petition. On January 28, 1938, the city controller, who, in default of the enactment of a budget before the end of 1937, was left without authority to countersign warrants for the payment of running expenses of the city government from and after January 1st, filed his petition in this court, asking leave to intervene and to be made a party in this case, and for an order authorizing him to approve the payment of expenses[3] necessary to maintain the city government from and after January 1st. His petition contained, among others, the following averments:

"3. The failure of the City and County of Philadelphia to meet the payrolls of its various employees has given rise to great emergency by reason of the fact that the patrolmen, city firemen and others in vitally important positions have been unpaid since January 1, 1938.

"4. By reason of said situation there is grave danger of a breakdown in the functioning of the agencies of the City and County government; that such breakdown, if it happens, will threaten and jeopardize the enforcement of law and order and the lives and property of the two million citizens of the City and County of Philadelphia.

---

[3] The prayer was in these words: "Wherefore in view of the certainty of the enactment of said budget for the City and County of Philadelphia for the year 1938 and in further view of the extreme hardships and deprivations now imposed upon the 19,000 employees of the City and County of Philadelphia, and in further view of the threatened breakdown in the City and County governments heretofore referred to, your petitioner respectfully prays that the Court in the exercise of its equitable jurisdiction modify and amend its order [of January 24] so as to authorize your petitioner immediately to approve the payment of City and County payrolls for the month of January, 1938, such action being imperatively necessary by reason of the public interest."

"5. That the Treasurer of the City and County of Philadelphia presently has on hand money sufficiently available to meet these payrolls.

"6. That the petitioner is prepared to direct immediate payment of said payrolls if authority is given by your honorable Court so to do.

"7. That in compliance with the order of your honorable Court in the above stated case to complete enactment of the budget on or before January 31, 1938, the City Council has proceeded to do so and such a budget for the year 1938 is now in the course of preparation and enactment."

An order was made as prayed for. On February 15th the controller filed a second petition for leave to make payments accrued since February 1, 1938, and, in the emergency, leave was granted.

On February 1st, the return day of the peremptory writ issued by this court, respondents filed a return averring compliance with it and asking to be dismissed. The return was deemed insufficient; we directed that the writ be "continued in full force and effect until defendants comply therewith by adopting a budget and a financial program according to law as heretofore ordered." On May 2d a return was filed alleging compliance with the order and on May 6th a reply was filed by petitioner admitting the averments of the return; the appeal may therefore now be finally disposed of.

It is contended, on behalf of the relator, that the statute imposes certain mandatory duties on the mayor, the city controller and the council, requiring them to do certain things necessary for the city government during the ensuing year and that the appeal presents no problem of statutory construction; that the words of the Act, in their common and generally understood sense, are mandatory, and that the officers—the mayor, the controller and council—have no option but to comply with the mandate. On the other hand, the learned city solicitor contends that the provisions are not manda-

tory but are merely directory or discretionary, and that the officers, or any of them, at pleasure may disregard the time specified by the legislature for the performance of the duties imposed on them. Construction is necessary only if the expressions used will bear two or more meanings. In applying a statute, it is first necessary to ascertain the meaning of the words used by the legislature; that meaning is matter of fact; having ascertained the meaning, the next step is to determine what the legislature intended should be their legal effect. The words used in the Charter Act have a commonly accepted meaning, about which difference of view seems impossible; if the words are given that meaning, there is no doubt they are mandatory: "the mayor *shall furnish*;"[4] "the estimates of receipts and liabilities *shall be furnished* to the mayor by the city controller;[5] he *shall also furnish* to the mayor. . . ." (Section 1.) "Immediately after the receipt of such statement [by the mayor] the *council shall consider* . . . and the council *shall,* in one ordinance, on or before the fifteenth day of December following, *adopt* a financial program for the ensuing year. . . ." (Section 2.) "On or before the same date, the council *shall levy and fix a tax rate* for the ensuing year. . . ." (Section 3.) ". . . and the city controller *shall not* countersign any warrants (except for payment of interest and for sinking-fund) pertaining to any of the appropriations until the said council *shall have first passed* all appropriations necessary for the expenses for the current year of each department, officer, board, commission, trust, committee, or other agency whose financial requirements are to be met out of the proceeds of taxes levied by the council or out of any other funds over which the council has con-

---

[4] Italics added.

[5] For the difference between the controller's present and former duties, compare this act with the Act of June 11, 1879, P. L. 130, as amended by the Act of May 9, 1913, P. L. 195.

trol, *nor shall* said officer countersign any warrants, except as aforesaid, until the total of all appropriations and all lawful obligations (other than as aforesaid) as estimated by the city controller, *shall have* been brought within the sum of the estimated receipts from taxes and from other sources except loan funds." (Section 4.) This fourth section contains other provisions of the same peremptory character.

As the words, in fact, are mandatory, the next step in the inquiry suggested by respondents, is whether the legislature intended the words to be given their usual meaning, that is, a mandatory sense. Appellant says that was the intention; appellees deny it, and say the word "shall", so frequently used in the Act, was not intended to be used in its ordinary sense, but in the extraordinary sense of "may", and that the common meaning of the words should be disregarded, and instead, the word *may* should be substituted for the word *shall.*

Questions of this kind have so often appeared for consideration, that variously expressed rules or aids to construction have become recognized in dealing with them. Before particularly referring to these rules, attention must be directed to section 13 of the Act of March 21, 1806, 4 Sm. L. at page 332, 46 PS section 156: "That in all cases where a remedy is provided, or duty enjoined, or anything directed to be done by any act or acts of assembly of this commonwealth, the directions of the said acts shall be strictly pursued. . . ."

The subject matter of the statute is the local government of Philadelphia. As has been said, the particular sections for consideration appear in Article XVII, which is entitled, Finance.[6] It contains the commonwealth's delegation of the power to tax for municipal purposes and the restrictions on the municipal spending power. It is elementary that delegated taxing power

---

[6] The legislative journals show that, when the bill was introduced, the title of this division was "Budget".

is subject to strict construction: compare *Wilson v. Phila. School District,* 328 Pa. 225, 195 A. 90. The rate of taxation shall be fixed by December 15th; and this absolute direction is followed by a negative or alternative provision that in default of performance of that duty "the rate for the current year shall be the rate for the ensuing year", with the additional consequence, for the ensuing year, that city "expenditures . . . shall be fixed and determined by the council so as to come within the estimated receipts from sources other than loans." In other words, if the delegated officers do not fix the rate by December 15th, they are prohibited from doing so later, and, for the next year, expenditures from taxes on property then subjected to taxation are limited to the taxes at the old rate on that class of property.

We all agree that mandatory duties are imposed on the officers mentioned, taking the words of the statute in their common meaning, and that there is no necessity to resort to rules of construction. But as the learned court below was of opinion, and respondents' argument is to the same effect, that the legislature, while using mandatory words, intended to vest power exercisable at discretion, we shall briefly examine the contention. It is said in respondents' brief, that "the mere fixing of a time for the doing of a particular act, unless negative language is employed or unless an alternative consequence is provided for, is merely directory as to the time limit. . . ." Now, as has been noted, the legislature not only used mandatory words, but in addition used the equivalent of "negative language" and also provided an "alternative consequence". What could be more negative in effect or more completely "an alternative consequence" than declaring that for default in fixing a rate by December 15th, the old rate should apply for the new year and carry with it corresponding restrictions on expenditures? In addition, we must keep in mind that we are applying a statute providing for municipal government from year to year

without interruption and that every duty imposed was intended to be performed so that the municipal government might proceed from day to day without interruption. A headnote to the report of *Bladen v. Philadelphia*, 60 Pa. 464, is cited by appellees as supporting their position; but, so far as the case can have any application, the point decided in it is against their argument. The statute there involved declared that no debt or contract should be binding "unless authorized by law or ordinance, and an appropriation sufficient to pay the same be previously made by councils". Plaintiff was employed as a clerk by the board of health at a salary fixed by the board at $2,000 a year; councils had appropriated only $1,400; it was held he could not recover more. The case therefore involved a contention that the contract of employment at the salary fixed by the board was enforceable notwithstanding the city's failure to appropriate enough money to pay that salary. SHARS-WOOD, J., said, p. 466, "Where the words are affirmative, and relate to the manner in which power or jurisdiction vested in a public officer or body is to be exercised, and not to the limits of the power or jurisdiction itself, they may and often have been construed to be directory; but negative words which go to the power of jurisdiction itself have never, that I am aware of, been brought within that category. . . . The words of the 5th section of the Act of April 21st, 1858, Pamph. L. 386, are words of positive prohibition."[7] The statutory provision involved in that case is not more prohibitive of action by council than the provision "If the council shall fail to fix a tax rate on or before the 15th day of December of any year, the rate for the current year shall be the rate for the ensuing year", and this legislative intention, as applied to the whole financial program, is emphasized by the further limitation of expenditures during the ensuing

---

[7] This is merely one of a large number of familiar cases holding that municipal contracts must conform to statute.

year to estimated receipts, as specified. Additional emphasis to the same effect is contributed by section 4 which contains a number of positive prohibitions on action by the controller and council. Moreover, if we apply the rule in the form "that whether a statute is mandatory or not depends on whether the thing directed to be done is of the essence of the thing required" (see *Deibert v. Rhodes*, 291 Pa. 550 at 554, 140 A. 515; *National Transit Co. v. Boardman*, 328 Pa. 450, 453, 197 A. 239; *Tausig v. Lawrence*, 328 Pa. 408, 197 A. 235) we also reach the conclusion that the statute is mandatory, for unquestionably the integrity of the municipal government for 1938 depended on action in 1937 which is clearly what the statute provided.

It must not be overlooked that the legislature did not vest in council alone the duty of determining the revenue to be raised by taxation; it ordered that the mayor should furnish certain information on or before October 15th and also required, in order that the mayor might be properly informed, that the controller should supply him with certain information, known to him, in virtue of his office as the city's chief bookkeeper. The controller, therefore, must perform a particular duty to enable the mayor to do his duty in order that council may complete the work of all three by adopting the next year's financial program whether based on the old or on a new tax rate for the ensuing year; it is the joint product of the mayor, the controller and the council; the financial program must be adopted before the controller can authorize payment of expenses accruing on and after January 1st of the ensuing year.

The third and fourth paragraphs of the relator's petition for the writ of mandamus averred that on October 14, 1937, the city controller certified to the mayor a statement of estimated receipts and liabilities for the ensuing year in accordance with section 1 and that, on the same day, the mayor furnished a statement of estimated receipts and expenses for the ensuing year, and

that between October 14th and November 22d the mayor submitted several revised statements of estimated receipts and expenses, and that on or about November 22d he submitted a complete and final statement of the estimated receipts and expenses for the ensuing calendar year. The return denied these averments and asserted that "No positive or certain certificate of estimated receipts and disbursements was . . . submitted . . . [to respondents on the dates mentioned] or at any other time, . . . by the City Controller to the Mayor or transmitted to the Council." Respondents alleged that the statements submitted to them were uncertain and provisional and not as required by the statute. They aver "There was appended thereto a recital in substance and effect that the sum of $4,215,000 of possible revenue from the Municipal Gas Works was in abeyance and that 'as soon as a different plan of operation is adopted, the Controller will be glad to certify to City Council the revenue that could be expected to be received from such a plan.' Such a plan of operation is now pending and the early adoption of a plan is expected and until its adoption the final estimate of the City Controller will not be available." In support of the inadequacy of the statement submitted by the mayor, they also averred that the sinking fund commissioners, in their certificate to council, specifically stated that it was not final and that another certificate would be supplied but that it had not been done.

It is not now important to distribute among the officers responsible, the blame for the failure to comply with the statute, nor does the appeal require it. The necessity for the continuity of local government is so obvious that the form of the statute will tolerate no excuse for nonperformance of the duty imposed; no alleged justification for default can be accepted. A municipal officer who omits to perform a governmental duty imposed on him by statute, assumes grave responsibility and by his failure may render himself liable to

indictment, prosecution, and on conviction, to removal from office: *Com. v. Coyle*, 160 Pa. 36, 28 A. 576; *Com. v. Cauffiel*, 298 Pa. 319, 148 A. 311; *Com. v. Davis*, 299 Pa. 276, 149 A. 176; *Com. v. Cauffiel*, 97 Pa. Superior Ct. 202. But the community is not dependent merely on the sanctions of the criminal law. The legislature intended to provide a system of municipal government that would not "breakdown", as the controller, under oath, alleged, for want of the timely adoption of a budget. Failure to comply with the statute in this case[8] disabled or deprived the controller of his power to countersign payrolls for the 1938 running expenses, for payment of police, firemen and similar expenses, said to amount to several million dollars per month. The default of the city authorities does not render them immune from proceedings to require them to perform their duties. The legislature never intended that the City of Philadelphia should be without a government by mere default of its officers. The record shows that the city could not pay its running expenses for services beginning January 1st, with a resulting collapse in municipal government. If the default is of a character to justify prosecution, the criminal law may subject the defaulting officer or officers to indictments as indicated in the cases quoted above. Whether an action for damage will lie need not now be considered. But the Mandamus Act of June 8, 1893, P. L. 345, 12 PS section 1911, furnishes a method; that employed in this case. Section 4, 12 PS section 1914, provides: "When the writ is sought to procure the enforcement of a public duty, the proceeding shall be prosecuted in the name of the Commonwealth on the relation of the Attorney General: *Provided however*, that said proceeding in proper cases shall be on the relation of the district attorney of the proper county: *Provided further*, That when said proceeding is

---

[8] The Charter Act allows 14 days more, for the purpose, than was allowed by the prior law.

sought to enforce a duty affecting a particular public interest of the State, it shall be on the relation of the officer entrusted with the management of such interest. . . ." In *Dechert, Controller of the City and County of Philadelphia, v. Commonwealth*, 113 Pa. 229, at p. 235, 6 A. 229, CLARK, J., said: "It is well settled that mandamus will lie to compel the performance by public officers of duties purely ministerial in their character, but it is equally well settled that as to all acts and duties necessarily calling for the exercise of judgment and discretion on their part, mandamus will not lie. Whilst the writ may perhaps be awarded to set the latter class of officers in motion, and to compel action upon the particular matters over which they may have jurisdiction, it will in no manner interfere with the exercise of that discretion nor control or dictate the judgment, or decision which shall be reached. It is unnecessary to quote authorities in support of this plain and well established principle of the law; such has been the uniform course of all the decisions, and in this case we do not understand the doctrine to be denied." The court will not control discretion properly exercisable by the officer but it will require him to act in good faith in the circumstances. A peremptory writ was issued requiring the mayor of Philadelphia to perform his duty in *Chelton Trust Co. v. Blankenburg*, 241 Pa. 394, 88 A. 664, notwithstanding the fact that he asserted that he was acting in the exercise of discretion. The auditor general was required to act in *Commonwealth ex rel. Bell v. Powell*, 249 Pa. 144, 94 A. 746, where he declined to comply with the statute because he thought it was unconstitutional. In *Jones v. O'Connor*, 252 Pa. 311, 97 A. 466, a writ was issued requiring a judge to hear a case in the courthouse in the county seat instead of in his chambers in another city; in *Com. v. Snyder*, 261 Pa. 57, 104 A. 494, the auditor general and state treasurer were compelled by mandamus to pay the salary of the banking commissioner; in *Commonwealth v. Scutt*,

262 Pa. 154, 105 A. 59, a writ issued to compel the school board to reinstate one of its members wrongfully removed; in *Coyne v. Prichard*, 272 Pa. 424, 116 A. 315, a writ issued against the bureau of building inspection directing it to grant a license to construct a garage where prerequisite conditions had been fulfilled; in *Pittston Township School District v. Dupont School District*, 275 Pa. 183, 118 A. 308, the writ issued against a school district to compel the levy of taxes to pay indebtedness to another district; in *Goldberg v. Philadelphia*, 279 Pa. 356, 123 A. 851, a writ was granted requiring the reinstatement of a police officer; in *Commonwealth ex rel. v. Schmidt*, 287 Pa. 150, 134 A. 478, an attachment for contempt was sustained against county commissioners for failing to comply with a writ;[9] in *Herskovits v. Irwin*, 299 Pa. 155, 149 A. 195, the writ issued against a building inspector to compel the issue of a building permit; in *Sinking Fund Commissioners v. Philadelphia*, 324 Pa. 129, 188 A. 314, the writ issued to compel payments into the sinking fund. See also, *Arthur v. Pittsburgh*, 330 Pa. 202, and *Simmler v. Philadelphia*, 327 Pa. 197.

The general equity jurisdiction is also available in a proper case: the Act of June 16, 1836, P. L. 784, section 13, 17 PS section 282, conferred jurisdiction ". . . so far as relates to . . . V. The prevention or restraint of the commission or continuance of acts contrary to law, and prejudicial to the interests of the community, or the rights of individuals." Compare *Wilson v. Philadelphia School District*, 328 Pa. 225, 195 A. 90.

As it appears by their return, that respondents have complied with the peremptory writ issued by this court, it will be sufficient now, for the reasons stated, to order only that the decree of the learned court below be reversed, costs to be paid by respondents.

---

[9] See Chief Justice LOWRIE's address to the members of the Pittsburgh Councils and the order made in the case of *Com. v. Taylor et al.*, 36 Pa. 263.